UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DWAYNE H. NANCE,

        Plaintiff,

        v.                                 22-CV-447-LJV
                                              DECISION & ORDER

DENIS R. McDONOUGH, *et al.*,

        Defendants.
_____

On June 13, 2022, the *pro se* plaintiff, Dwayne H. Nance, commenced this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Whistleblower Protection Act ("WPA"), and the New York State Human Rights Law ("NYSHRL"). Docket Item 1. He asserts claims of racial discrimination and retaliation arising from his employment with the United States Department of Veterans Affairs ("VA"), and he sues Denis R. McDonough, Secretary of the VA, and Frank Riggi, the Chief of Sterile Processing Services ("SPS") at the VA hospital in Buffalo, New York. *Id.*

On November 8, 2022, the defendants moved to dismiss the complaint, Docket Item 7; on December 29, 2022, Nance responded,[1] Docket Item 12; and on January 6, 2023, the defendants replied, Docket Item 13.

---

[1] In his response, Nance moved under Federal Rule of Civil Procedure 12(f) to "strike and remove misinformation and false evidence from [his employment] records." Docket Item 12 at 6-7 (capitalization omitted). Because Rule 12(f) does not give this Court the power to alter Nance's employment records, that motion is denied. *See* Fed. R. Civ. P. 12(f) (providing that a court may strike certain content "from a *pleading*" (emphasis added)).

For the reasons that follow, the defendants' motion to dismiss is granted in part and denied in part. Nance's Title VII claim for racial discrimination may proceed against McDonough, but other claims are dismissed, and the remaining claims will be dismissed unless Nance files an amended complaint correcting the deficiencies identified below.

## BACKGROUND[2]

On February 6, 2017, Nance, who is Black, Docket Item 1 at 5, started work as a Medical Supply Technician in the SPS department at the VA Western New York Healthcare System. *Id.* at 2, 8-9, 15. After completing some training, Nance was assigned to the 3:00 p.m. to 11:30 p.m. shift, which was supervised by Bryant Harris, who is Hispanic. *Id.* at 4, 10.

"Initially, things went well," and Nance rotated through different assignments. *Id.* at 10. But "after about a month," Nance "found [him]self constantly being placed in the sterilization area." *Id.* The "lack of rotation" to assignments other than the sterilization area "severely hampered [Nance's] development." *Id.* Nance specifically took issue with the fact that "Harris was not rotating [him] properly into the decontamination room." *Id.* at 4.

Nance had several tasks when assigned to the sterilization area, including gathering dirty surgical instruments from "separate clinics throughout the hospital";

---

[2] On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). The following facts are taken from the complaint, Docket Item 1, and the documents attached to the complaint. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (noting that a complaint is deemed to include any written instrument attached to the complaint, incorporated by reference, or "integral" to the complaint).

packaging and labeling the instruments; sterilizing the instruments, trays, and other supplies; and emptying the washing machines.  *Id.* at 10.  Nance performed those tasks while Harris "stay[ed] seated the whole . . . shift."  *Id.* at 10-11.  In fact, "everyone in the department frequently complain[ed]" about Harris's unwillingness to help with the work.  *Id.* at 11; *see id.* at 3-4.

But that was not Nance's only problem at the VA hospital:  In summer 2017, an incident at the hospital created issues that exacerbated the challenges Nance faced because he had not been rotated properly.  More specifically, when a Black employee named Damon "incorrectly cleaned" an endoscope "while working in the GI lab," *see id.* at 2, 11, a "huge crisis" led to "a lot of negative publicity" in the local news, *id.* at 11, and to "a federal investigation," *id.* at 2.  Once the investigation began, SPS Chief Riggi told Nance's shift that "the SPS department could be shut down" and that Riggi's "job was in jeopardy."  *Id.*  And after that, the employees were concerned about their own positions.  *Id.* at 2, 11.

Nance, a "new hire," "felt even more pressure."  *Id.* at 11.  So in August 2017, he met with Riggi to share his concerns that he "had not been properly rotated."  *Id.* at 2, 11.  Nance told Riggi that his "skills pertaining to the GI lab and decontamination areas w[ere] a little rusty," and he asked "to spend more time in th[o]se areas."  *Id.* at 11.  Riggi "scheduled [Nance to] retrain with special assistant [] Shannon Cross," *id.*, which Nance did, *id.* at 12.  And Nance received a positive evaluation from Cross after completing the retraining.  *Id.* at 3, 12.

But despite Nance's strong performance, Nance often was targeted by Harris as retaliation for Nance's having raised concerns about his rotation assignments.  *See id.*

3

at 3 (alleging that Harris's actions were "retaliatory"); *id.* at 11 (alleging that Harris intended "to misdirect the attention from himself to [Nance]").  For example, Harris told Riggi at least twice that Nance was "slow" at his work and that he "remind[ed] [Harris] of [] Damon," the employee who had "caused [] Riggi so many problems."  *Id.* at 11-12.  After Harris compared Nance to Damon, "Riggi started to treat [Nance] differently."  *Id.* at 11.

Harris also targeted Nance in other ways, including by repeatedly filing complaints against him.  *Id.* at 3.  Once, when Nance tried to use a "pass" that he had been awarded by another supervisor, Assistant Chief Marian Mclean, "to get off early," Harris was "upset because he had to get up" and "clean the scope."  *Id.* at 12.  But despite Harris's "attempts to undermine" Nance, Nance "kept [his] focus on getting better" and received a positive evaluation from Mclean in November 2017.[3]  *Id.*

Nance also had some negative interactions with Riggi.  For example, in November 2017, Nance and Riggi disagreed about the correct way to clean a laryngoscope.  *Id.* at 4-5.  "Riggi insisted that the laryngoscope was waterproof," so the next day, Nance "placed a few laryngoscopes in . . . liquid" to clean them.  *Id.*  When the liquid damaged the scopes, Nance and a coworker told Riggi that his "new cleaning procedure . . . was faulty."  *Id.* at 5-6.  Although Nance's coworker was present, Riggi "singled out" Nance during the interaction.  *Id.* at 7.  Nance now believes that Riggi intentionally caused Nance to damage the scopes so that Riggi would have an excuse

---

[3] During the evaluation, Nance told Mclean about his "lack of rotation."  Docket Item 1 at 12.  Mclean had not been aware of that issue, so she "suggested that [Nance] write a letter regarding the matter" for his file.  *Id.*  Nance did so and gave the letter to Mclean.  *Id.*

to terminate Nance's employment. *Id.* at 5. Around the same time, Riggi observed Nance's shift and "refuse[d]" to "acknowledge" Nance when another employee praised Nance's work. *Id.* at 13.

In early December 2017, Nance worked several overtime morning shifts and received positive feedback from the other employees on those shifts. *Id.* After one of those shifts, Riggi terminated Nance's employment, supposedly "because of [Nance's] performance." *Id.* But Nance believes that he was terminated because of Harris's complaints. *Id.* at 3; *see id.* at 14 (alleging that because Riggi rarely observed Nance's shift in person, he was "easily manipulated" by Harris).

Riggi was not cooperative when Nance asked questions about the termination: He did not respond to Nance's suggestion that there were no performance issues, *id.* at 13; he refused to ask Nance's coworkers about Nance's performance, *id.* at 14; and he would not let Nance speak with a human resources representative even though Nance "ask[ed] for a representative to help [him] understand what was going on," *id.* at 6, 14. Riggi then "proceeded to rush [Nance] out [of] the office." *Id.* at 14.

On or around May 4, 2018, Nance filed a complaint of employment discrimination with the VA, alleging that he was discriminated against "based on race and color." *Id.* at 9, 15. Eventually, an Administrative Judge from the Equal Employment Opportunity Commission ("EEOC") dismissed Nance's complaint and the ground that "the evidence

. . . did not establish any discrimination."[4]  *Id.* at 16.  Although Nance appealed that decision and moved for reconsideration, he was unsuccessful.[5]  *See id.* at 15-17.

Nance then commenced this action on June 13, 2022.  *See* Docket Item 1.

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

I.  **TITLE VII CLAIMS**

   A.  **Title VII Claims Against Riggi**

"In a federal employee's discrimination suit under Title VII, the head of the department, agency, or unit, as appropriate, shall be the defendant."  *Noveda v. U.S.*

---

[4] Nance takes issue with that finding, but he does not clearly articulate why.  *See* Docket Item 1 at 4.  It seems that he believes Riggi and Harris lied during the administrative investigation.  *See id.* at 4-5.

[5] In the decision denying Nance's request for reconsideration, the EEOC noted that it did not consider Nance's allegations of "retaliation and a hostile work environment" because those allegations "were not included in his underlying complaint."  Docket Item 1 at 16.

*Postal Serv.*, 2023 WL 5152694, at *1 (S.D.N.Y. July 18, 2023) (citation and internal quotation marks omitted); *see* 42 U.S.C. § 2000e–16.  In other words, when a federal employee seeks relief under Title VII, he must sue the head of the agency for which he works or worked.  If the employee asserts Title VII claims against other defendants, those claims must be dismissed.  *See, e.g.*, *Ross v. Dep't of the Army*, 2023 WL 5494644, at *3 (E.D.N.Y. Aug. 24, 2023) (dismissing plaintiff's Title VII claims against all defendants other than the Secretary of the Army).

Here, Nance properly asserts Title VII claims against Secretary McDonough, the head of the VA.  *See* Docket Item 1 at 1.  But as the defendants argue, Docket Item 7-1 at 4, Nance's Title VII claims against Riggi must be dismissed because Riggi is not the head of the VA, *see Noveda*, 2023 WL 5152694, at *1.  Because amendment of Nance's Title VII claims against Riggi would be futile, *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000), those claims are dismissed without leave to amend.

B.     **Failure to Exhaust Retaliation Claims**

"Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court."  *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citations omitted).  Under a narrow exception to the exhaustion requirement, "claims not raised in an [administrative] complaint may still be part of the complaint later filed in federal court if they are reasonably related to the claim filed with the agency."  *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (citation and internal quotation marks omitted).  A claim is reasonably related "if the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made."  *Id.* (citation omitted).

The defendants argue that Nance failed to exhaust his administrative remedies for his retaliation claims. Docket Item 7-1 at 5-8. More specifically, they note that Nance "framed his [administrative] complaint as one for 'discrimination'" and did not allege retaliation or "any protected activity that could form the basis for a retaliation claim." *Id.* at 7-8 (citing Docket Item 1 at 8-14). And they say that Nance's retaliation claims are not reasonably related to the allegations of discrimination raised in his administrative complaint because the EEOC did not have "any basis to investigate an allegation of retaliation." *Id.* (quoting *Boyar v. Yellen*, 2022 WL 120356, at *2 (2d Cir. Jan. 13, 2022) (summary order)).

Nance responds that he "mentioned" retaliation at some point in the administrative proceedings.[6] Docket Item 12 at 2. But that is not enough to establish that his retaliation claims are reasonably related to his administrative complaint. In fact, when the EEOC denied Nance's motion for reconsideration, it explicitly declined to consider Nance's newly raised allegations of retaliation because "th[o]se allegations were not included in his underlying complaint." Docket Item 1 at 16. And Nance's administrative complaint confirms the EEOC's observation: Nothing in the administrative complaint suggests retaliation, *see id.* at 9-14, and the EEOC therefore could not have reasonably known to investigate any retaliation.

For that reason, Nance's retaliation claims are not reasonably related to the allegations in his administrative complaint, and Nance has not exhausted his

---

[6] Nance has not filed any documents from the administrative proceeding that mention retaliation; according to the defendants, however, Nance mentioned retaliation in his "brief in opposition to summary judgment during the EEOC proceedings." *See* Docket Item 13 at 4 n.5.

8

administrative remedies for those claims.  Nance's retaliation claims therefore are subject to dismissal.  Nevertheless, in light of his *pro se* status, *see Cuoco*, 222 F.3d at 112, Nance may amend his complaint to allege facts establishing that he exhausted his administrative remedies for his retaliation claims.

    **C.**    **Failure to State a Retaliation Claim**

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate that (1) [he] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citation and internal quotation marks omitted).  "A plaintiff engages in protected activity when [he] (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding[,] or hearing arising under Title VII."  *Davis v. N.Y. State Dep't of Corr. Attica Corr. Facility*, 110 F. Supp. 3d 458, 462 (W.D.N.Y. 2015) (citation and internal quotation marks omitted).

The defendants argue that Nance "has failed to allege that he was retaliated against for engaging in protected activity."  Docket Item 7-1 at 10.  More specifically, they say that neither Nance's complaints about the laryngoscope cleaning procedures nor his complaints about Harris's failure to rotate his assignments constitute protected activity.  *Id.*  Despite Nance's assertions to the contrary, *see* Docket Item 12 at 7-9, the defendants are correct:  Nance's complaints were not protected activity because Nance did not complain about conduct prohibited by Title VII.  For example, he did not

9

complain that Harris failed to rotate his assignments because of Nance's race.  *See generally* Docket Item 1.

Nance therefore has not established that he engaged in protected activity.  For that reason, he has failed to state a Title VII claim for retaliation.  Nevertheless, and again in light of his *pro se* status, *see Cuoco*, 222 F.3d at 112, Nance may amend his retaliation claim to allege facts establishing that he engaged in protected activity.[7]

### D.     Racial Discrimination Claims

It seems that the defendants do not read the complaint as asserting a claim for racial discrimination under Title VII.  *See generally* Docket Item 7-1.  But because this Court must construe *pro se* complaints liberally, *see Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest), and because Nance attached his administrative complaint alleging discrimination to his federal complaint, *see* Docket Item 1 at 9-14, this Court assumes that Nance intends to assert a Title VII claim for racial discrimination here.

The defendants moved to dismiss the complaint "in its entirety," Docket Item 7-1 at 1, but they did not make any substantive argument in support of dismissal of Nance's Title VII discrimination claims, *see* Docket Item 7-1; Docket Item 13.  Therefore, to the extent the defendants have moved to dismiss those claims, that portion of the motion is

---

[7] The defendants do not explicitly argue that Nance has failed to plausibly allege the other elements required to establish a *prima facie* case of retaliation, *see generally* Docket Item 7-1, so the Court does not address those elements.  Nance is forewarned, however, that any amended complaint should include facts establishing that his employer was aware of any alleged protected activity and that there was a connection between the protected activity and any adverse employment action Nance experienced.

denied and Nance's Title VII discrimination claims may proceed against McDonough, the proper defendant in this Title VII case.

## II.     NYSHRL CLAIMS

"Title VII 'provides the exclusive judicial remedy for claims of discrimination in federal employment' based on race, color, religion, sex, or national origin." *Kugler v. Donahoe*, 2014 WL 1010317, at *8 (E.D.N.Y. Mar. 17, 2014) (quoting *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976)).  And because Title VII is the "exclusive judicial remedy for claims of discrimination in federal employment," a federal employee may not pursue employment discrimination claims under state law.  *See Brown*, 425 U.S. at 835; *see also Rivera v. Heyman*, 157 F.3d 101, 105 (2d Cir. 1998) (affirming dismissal of federal employee's NYSHRL claims because "allowing such claims [to proceed] would easily circumvent *Brown*'s holding that the Title VII remedies were exclusive"); *Kugler*, 2014 WL 1010317, at *8 (noting that allowing a federal employee to pursue state law claims for employment discrimination "would render meaningless the rigorous administrative exhaustion requirements and time limitations of Title VII" (citation and internal quotation marks omitted)); *Spinelli v. Sec'y of Dep't of the Interior*, 2006 WL 2990482, at *9 (E.D.N.Y. Oct. 19, 2006) ("[P]ermitting federal employees to invoke state law remedies for claims of employment discrimination would work an impermissible end-run around Title VII's administrative requirements." (citation and internal quotation marks omitted)).

Nance asserts claims under the NYSHRL.  *See* Docket Item 1 at 2.  But as the defendants argue, Docket Item 7-1 at 4-5, those claims "must be dismissed because Title VII is the exclusive means to remedy any valid claim of retaliation [or employment

discrimination] that [he] may have," see *Kugler*, 2014 WL 1010317, at *8.  And those claims are dismissed without leave to amend because amendment would be futile.  See *Cuoco*, 222 F.3d at 112.

### III.    WHISTLEBLOWER PROTECTION ACT CLAIMS

Nance invokes the WPA throughout the complaint and his response to the motion to dismiss.  *See, e.g.*, Docket Item 1 at 3, 5; Docket Item 12 at 7-8.

"The WPA is part of the CSRA [Civil Service Reform Act of 1978] and prohibits certain federal employees from taking adverse personnel actions against 'any employee' for reporting 'any violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.'"  *Chinniah v. Fed. Energy Regul. Comm'n*, 62 F.4th 700, 702 (2d Cir. 2023) (alteration and footnote omitted) (quoting 5 U.S.C. § 2302(b)(8)(A)).  "Under the CSRA, employees with WPA claims must generally 'seek corrective action from the Office of Special Counsel' and then 'the Merit Systems Protection Board.'"  *Id.* (alterations omitted) (quoting 5 U.S.C. § 1214(a)(3)).  "'A petition to review a final order of the Board' that raises a claim under only the WPA 'shall be filed in the United States Court of Appeals for the Federal Circuit or any court of appeals.'"  *Id.* (alteration omitted) (quoting 5 U.S.C. § 7703(b)(1)(B).  Under the CSRA—which is "the exclusive remedy for claims brought pursuant to the WPA"—"exhaustion of administrative remedies is a jurisdictional prerequisite to suit."  *Id.* (citations omitted).

Here, Nance does not allege that he "file[d] a complaint with the Office of Special Counsel or the Merit Systems Protection Board, as required by the CSRA."  *See id.* at 703 (citing 5 U.S.C. § 1214(a)(3)).  "Instead, he went straight to federal court."  *See id.*

This Court therefore lacks "jurisdiction to entertain a whistleblower cause of action . . . because [Nance] failed to follow the proper administrative process,"[8] *see id.* (citation and internal quotation marks omitted), and any claims asserted under the WPA are subject to dismissal for that reason.  Nevertheless, and again in light of his *pro se* status, *see Cuoco*, 222 F.3d at 112, Nance may amend his complaint to add facts establishing that he exhausted his remedies as to his WPA claims.

## CONCLUSION

For the reasons stated above, the defendants' motion to dismiss, Docket Item 7, is GRANTED in part and DENIED in part.  Nance's Title VII claims against Riggi and his NYSHRL claims are dismissed.  His Title VII claims for racial discrimination may proceed against McDonough.  His remaining claims will be dismissed unless, within **45 days of the date of this order**, Nance files an amended complaint correcting the deficiencies identified above.

Nance is advised that an amended complaint is intended to ***completely replace*** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect."  *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (citations omitted); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Therefore, any amended complaint ***must include all allegations against each of the***

---

[8] As the defendants note, Nance "could have pursued a 'mixed case' with the Merit Systems Protection Board . . . in which he simultaneously pursued whistleblower and discrimination claims."  Docket Item 13 at 7 n.6.  Nance did not do so, however, and his failure to exhaust his whistleblower claims is fatal.  *See Chinniah*, 62 F.4th at 703 (noting that administrative exhaustion is required even in "mixed cases" alleging both whistleblower and discrimination claims).

***defendants*** so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

The defendants shall answer or otherwise respond to any amended complaint within 30 days of the date the amended complaint is filed.  If Nance does not amend his complaint, McDonough shall answer or otherwise respond to the complaint within 75 days of the date of this order.


SO ORDERED.

Dated:   January 2, 2024
            Buffalo, New York


                                                                    /s/ Lawrence J. Vilardo
                                                                  LAWRENCE J. VILARDO
                                                                  UNITED STATES DISTRICT JUDGE